FILED
2026 Jan-26 AM 11:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

7:24-cv-151-ACA

Z.P., et al.,
Plaintiffs/Counter-Defendants,

v.

ERROL GREGORY BRYANT,
Defendant/Counter-Plaintiff.

* * * * * * * * * * * * * * * * * * * * *

# TRANSCRIPT OF MOTION HEARING

DECEMBER 5, 2025

HUGO L. BLACK UNITED STATES COURTHOUSE
1729 5TH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203

BEFORE THE HONORABLE ANNEMARIE CARNEY AXON
UNITED STATES DISTRICT JUDGE

COURT REPORTER:
B. Stone Arledge, RPR, CRR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205)278-2067

A P P E A R A N C E S

FOR PLAINTIFFS/COUNTER-DEFENDANTS:

RICKY THOMAS CHAMBLESS, ESQ.
YURI ROGER LINETSKY, ESQ.
HANNAH PALMER
JACOB STEINMETZ
SARAH PHILIP
The University of Alabama School of Law Civil Law Clinic
Box 870392
Tuscaloosa, Alabama 35487
rchambless@law.us.edu
ylinetsky@law.ua.edu

FOR DEFENDANT/COUNTER-PLAINTIFF:

JAMES THOMAS BURGESS, JR., ESQ.
ERIN MONTAGUE AGRICOLA, ESQ.
Burgess Holmes, LLC
3618 Clairmont Avenue
Birmingham, Alabama 35222
tburgess@burgessholmes.com
eagricola@burgessholmes.com

JASON L. WOLLITZ, ESQ.
Attorney at Law
202 Lake Heather Reserve
Birmingham, Alabama 35242
jasonwollitz@gmail.com

ALSO PRESENT:

JACOB EPPERSON, ESQ.

(Proceedings commenced at 11:34 a.m. in open court.)

THE COURT: The matter to be taken up at this time is case number 24-151; Z.P., et al. versus Bryant, which is a hearing on a motion to compel. We have previously adjourned for a hearing on this matter and at the end of which I asked for information or I asked for documents establishing the course of the attempts to address the interrogatory responses which I have received and I have reviewed. I reviewed it sometime ago. I know we've had to move this hearing twice.

Let me begin. Mr. Chambless, are you -- well, why doesn't everyone identify themselves for the record, please.

MR. CHAMBLESS: Rick Chambless, staff attorney with the Civil Law Clinic for the plaintiff.

MR. LINETSKY: Yuri Linetsky with the Civil Law Clinic.

MS. PALMER: Hannah Palmer, legal intern for the plaintiff.

MR. STEINMETZ: Jack Steinmetz, legal intern for the plaintiff.

MS. PHILIP: Sarah Philip, legal intern for the plaintiff.

MR. BURGESS: Tom Burgess.

MS. AGRICOLA: Erin Agricola.

MR. WOLLITZ: Jason Wollitz.

MR. EPPERSON: Jacob Epperson.

THE COURT: Mr. Chambless.

MR. CHAMBLESS: Yes, Your Honor.

THE COURT: Can I get you to come to the podium, please. You were not at our last hearing.

MR. CHAMBLESS: No, I was not, Your Honor. I was representing the clinic in a -- or sitting before the state circuit court.

THE COURT: But you were at our initial scheduling conference.

MR. CHAMBLESS: Yes, Your Honor, I was.

THE COURT: And at that conference I made it clear that although I greatly appreciate the benefit of the Civil Law Clinic to the students we do not run federal litigation according to the law school's schedule. Do you remember that?

MR. CHAMBLESS: I remember it being discussed, yes, Your Honor.

THE COURT: Tell me what you mean by I remember it being discussed as opposed to you remembering me specifically saying we do not run the litigation calendar around the school schedule.

MR. CHAMBLESS: My recollection, Your Honor; and I admit I'm human and not perfect, but my recollection is when I made the request your response --

THE COURT: Can you pull your microphone closer, please.

MR. CHAMBLESS: When I made the request, the response we received was that -- and this was based on everyone's knowledge that one of the legal interns was going to Starnes as an associate. You said we could request her assistance to continue through the summer. The issue with that was Laura Allison made the statement she was actually not starting until August and that's the last I remember of the discussion, but I also recall -- I didn't ask we not do anything during the summer. I just asked that where possible if it could be taken into consideration or maximize the benefit to the students where possible. I don't believe I requested we skip the summer.

THE COURT: Did you see the deadlines that were set out in the scheduling order?

MR. CHAMBLESS: Yes, I did.

THE COURT: Okay. And so to the extent you were asked to respond for dates relating to depositions during the summer --

MR. CHAMBLESS: Yes, Your Honor.

THE COURT: -- did you believe that it was appropriate to use the fact that your students were not there as a reason for not conducting discovery?

MR. CHAMBLESS: I'm trying to --

THE COURT: I mean, let me just back up really quick, please, and say that I think that what I recall saying --

well, I do recall this; I don't think -- at the scheduling conference was that we would not tailor discovery to the law school's schedule but that to the extent because there are only two barred attorneys at the law school and you needed help I was sure that you would be able to get the assistance while the summer associate was at Starnes. That was in no way an indication that unless she was able to help you, you were somehow relieved, and I don't understand how that would be construed as such given the deadlines in the scheduling order.

MR. CHAMBLESS: Well, if I recall correctly, the deadline in the original scheduling order was for depositions to be completed by the end of May. I forget the exact day. You gave an exact date there at the end of May for that to happen. Due to the way the case had progressed at that point it became impossible to meet the deadlines and we requested along with an agreement with the defendant to extend all deadlines by six months. The new order placed depositions to be completed by November -- I forget the date, but in November. When this was sent out, this case was nowhere near ready for depositions.

THE COURT: When what was sent out?

MR. CHAMBLESS: When their request for dates first came out on May 20 or May 28th, I believe it was.

THE COURT: Well, it's not your decision whether -- I mean, if he wants to depose the plaintiffs, whether or not you

believe that he's ready to depose them is of no relevance.

MR. CHAMBLESS: Yes, Your Honor, that is true.

THE COURT: Okay. So instead you were like, yeah, we're busy this summer. We're traveling.

MR. CHAMBLESS: I was attempting to explain the situation. It would be -- we could not get them by the end of June. One, we couldn't get the girls, and I didn't state this as eloquently as I should have. I get that.

THE COURT: Not eloquently; you didn't state that at all. In your letter dated June 9th, you said, I'm writing in response to your May 28th correspondence requesting available dates for plaintiffs to give depositions during the last two weeks of June. Due to summer travel schedules neither me nor Yuri Linetsky will be available in June or July. In addition, our fall semester does not begin until the week of August 15. We assign cases to new clinic students the first week of class and then they will need time to become reacquainted with the case materials and coordinate logistics for the depositions. For these reasons, it is simply impossible to meet your proposed timeline for the depositions.

MR. CHAMBLESS: And at that time -- excuse me; my mouth -- I'm taking medication that has my mouth very dry right now. I did believe that the girls trying to get them was going to be hard as well, but I believe we communicated that via telephone. We were talking more. And, yes, both

Professor Linetsky and I were scheduled to be moving around during the summertime for other projects. I probably should have explained more of that, but I still stand by that it would have been -- at that point any depositions taken in June would have had to have been repeated mainly because we did not at that time know the defendant's actual counterclaims what was going to survive. We were still trying to get the written discovery completed. And as I said, I didn't include that in the letter and I probably should have in order to be complete, but I stand by that the case was just simply not ready there and to do it would have been a waste of resources.

THE COURT: That is not your decision. When a party -- I'm very concerned. First of all, I find the fact that you just ignored what I said problematic and I find it very difficult. I'm very anxious about the fact that this is taking place while students are supposed to be learning how to practice law from you, and I have letters where I'm just -- we're not available and then we need to get the kids up -- excuse me; I don't mean kids. I still refer to myself as a girl, if that makes you feel better.

And then you're like, you know, look, June and July is bad for us then we got to get the -- we have to get the students up to date; this is not good for us, which is not how you conduct the practice of law. Relatedly, there was other correspondence, which as I mentioned I've reviewed this a

while back and I can't find it now. But there was a letter relating to a court deadline from Mr. Burgess, and your response was I will give this the importance it's due.

MR. CHAMBLESS: All the consideration it was due, yes.

THE COURT: All the consideration that was due.

MR. CHAMBLESS: That was my statement.

THE COURT: Is that professional conduct? Yes or no.

MR. CHAMBLESS: I honestly don't see it as unprofessional. It could be --

THE COURT: Do you think speaking to another professional like that is appropriate? How does that further your client's interest?

MR. CHAMBLESS: At this point, Your Honor, I think anything I say is going to inflame the situation, but I believe it does advance in that it prevents them having multiple absences from work and jobs in order to accomplish this. It also -- you know, at the time we were very frustrated and trying to get things lined up to get just the written discovery answered, and all the consideration it is due, yes; that's acknowledgment it was due our consideration. It was an acknowledgment that we would try to talk to them and find some dates. I don't think it was a complete unprofessional dismissal. You know, in email it's very hard to read context because you can't see the person's face; you can't read body language; you can't hear inflection, so -- but

I don't see it as an unprofessional remark in that situation. If the court disagrees, I'll accept the court disagrees.

THE COURT: I will just let your students know that to the extent that somebody writes you about an upcoming deadline that's set up by the court it does not benefit you or your client to respond I'll give all consideration this is due, and there are not many other ways to interpret that regardless of tone, inflection and the like.

Let's get to the interrogatory responses.

MR. CHAMBLESS: Yes, Your Honor.

THE COURT: I look at these interrogatory responses, and it seems to me that your plaintiffs are not really engaged in this process. Is that a fair characterization?

MR. CHAMBLESS: No, Your Honor.

THE COURT: Okay.

MR. CHAMBLESS: They were involved and have met, and this is part of the difficulty of having so many different interns work on a case of -- subsequent cases. They have been involved in trying to get the information to us and in sending. They were also extremely, extremely hesitant to give further information that they thought would put their personal -- their persons in jeopardy of being hurt further. For that reason, they --

THE COURT: What do you mean by that?

MR. CHAMBLESS: They were scared of Mr. Bryant, quite

frankly. That's the only way to put it. Whether it was rational fear or not, I'm not a psychologist; I couldn't tell you that, but I can tell you they were extremely afraid. As we went through the process of trying to re-respond; and once again I apologize. My mouth is dry as a bone.

As we went through that, they still remained, and I believe our students can tell you just how concerned they were. When we -- also, we felt many of the questions were vague as to what they actually wanted, and that was just -- that was not necessarily my decision. Professor Linetsky had looked at it; other interns had looked at it in coming up with those initial responses.

When we had the July 25th phone call wherein Mr. Burgess explained what he was looking for, we agreed we would sit back down with the clients again and go through and try to get the specific information he wanted, but we would need some time to do that. We promised him to hopefully have that by the end of August. It turned out it was September 3rd when they actually got it. Our clients at this point are out of school and working. One of them only has nights -- works nights. It's hard to get her in, so we have to schedule because she's a nurse a couple weeks in advance for her request some way to be there; research she doesn't lose. So it was just -- it was very difficult in timing with them as well to get them to get back any information.

The initial responses were based on what we had and on information we gathered from telephone conferences in May and June with the -- with the girls. So, yes, we stand by our initial responses based on what we knew at the time. We have since supplemented, and, in fact, we have found out in the last two or three days that a couple -- we got more supplemental material from one of the girls just this week that we're getting ready to turn over, and we did propose alternative timing for the depositions per the second scheduling order. So we didn't ignore it. We didn't say we won't take depositions. We gave some dates. First, we gave a time period and the second time I gave I believe six different days that we -- and asked them to let us know and that's the last we heard about depositions.

THE COURT: Let me look at -- let's talk about some of your responses to the interrogatories. I'll note a substantial similarity between all of them. We have first the response to the second interrogatory which says, identify all individuals who you believe, or may have reason to believe, have knowledge or information as to the factual allegations in the pleading in this action. Briefly describe the knowledge or information each such individual possesses or that you believe such individual may possess. This is boilerplate.

You answered that you objected based on relevance, overbreadth, and privacy and then you identified healthcare

professionals but did not identify it in accordance with the definition of identify. You did not state what they knew. You identified other named plaintiffs, which is not identifying an individual or what they knew, and then you said close friends.

Let's start with your objections. How is the identification of people that may or do have knowledge about the facts in the complaint irrelevant?

MR. CHAMBLESS: Hearsay. It's going to come in. None of them -- no third party is going to have direct testimony except the healthcare professionals, and those have already been provided along with addresses for the healthcare professionals and workers. Family and friends, discussions inside that's -- we do not believe that that is -- would even be admissible in court or would lead to any discoverable evidence.

THE COURT: You don't decide admissibility; I do.

MR. CHAMBLESS: I understand that.

THE COURT: And you are required to provide them that information.

MR. CHAMBLESS: And I believe they have been provided the information.

THE COURT: When?

MR. CHAMBLESS: They were given most of this in our initial disclosures.

THE COURT: Okay. And you don't have anyone else? Are you prepared for me to limit --

MR. CHAMBLESS: No one else -- no one else at that time that we knew.

THE COURT: Have you subsequently added?

MR. CHAMBLESS: Yes. I believe the September 23rd or, excuse me; September 3rd responses that were supplemented did have, if I am remembering those correctly.

THE COURT: And your objection based on privacy, can you articulate that for me, please.

MR. CHAMBLESS: It was our belief that communications with family members would have a privacy issue attached to it, similar to a counselor being involved. Now, I don't have case law to point to on that, that that could be done.

THE COURT: Mr. Chambless.

MR. CHAMBLESS: But in our supplemented response we did give -- in an attempt to get there, we gave all the names and then all of them would have had information regarding just discussions.

THE COURT: On September 3rd, you did not supplement your answer to this question.

MR. CHAMBLESS: I'm looking at the response that --

THE COURT: What is the appropriate response when you do not want to answer a question and you think -- like, for example, this privacy concern that you had.

MR. CHAMBLESS: We could have laid out the basis for that objection, yes.

THE COURT: Correct. In fact, you're obligated to do that; isn't that correct?

MR. CHAMBLESS: Yes, Your Honor.

THE COURT: Okay.

MR. CHAMBLESS: We did not do that.

THE COURT: So you wrote words, but you did not respond to the second interrogatory.

With respect to the third, you said that the interrogatory which asked for the address, telephone number, permanent residential address, where they were employed and their cell phone sought private and sensitive personal identifying information. When a party seeks personal identifying information or sensitive information, what is the responding party's first line of defense?

MR. CHAMBLESS: You can contact me through my attorneys.

THE COURT: I'm sorry?

MR. CHAMBLESS: That they could be contacted through the attorneys, one. This is about the parties.

THE COURT: There is no suggestion here that they are looking to call them. They're asking for this information for discovery purposes and they're entitled to it, and if you're concerned about the privacy then you move for a protective

order.

MR. CHAMBLESS: Which is actually in place in this case.

THE COURT: Then there was no reason for you to be concerned about privacy.

MR. CHAMBLESS: Our clients here believe that if that information was given they would be harassed continually by Mr. Bryant.

THE COURT: That is a risk of litigation.

MR. CHAMBLESS: And I do understand that, Your Honor.

THE COURT: And if they are -- if they are not willing to provide information that is due to the opposing party then they don't need to pursue their litigation, but it is not appropriate for you under the guise of being them to say that you're not giving that information. It's not. I'll remind you that your clients are -- their names have not been disclosed; the defendant's has.

Did you review these interrogatory responses with each plaintiff before you provided them to counsel?

MR. CHAMBLESS: Yes, we did.

THE COURT: Did you review them before the responses were provided? In other words, did you draft these responses based on the information that you had and ask for approval to send them or did you send the interrogatories and ask them to provide responses that you later edited?

MR. CHAMBLESS: A mix of both of those.

THE COURT: Number 11. List any electronic device that you have used 2021 to 2025 to disclose, produce, store, or transmit any intimate -- I think --

MR. CHAMBLESS: Well, that's a mistyping.

THE COURT: -- visual depiction of yourself and identify the corresponding IMEI number. Include the device used, the mobile internet provider, the IP address, user, profile name, and phone number. You objected on the ground that this information was confidential and sensitive and should only be disclosed under a protective order.

You just told me there was a protective order in place. I don't think that you're actually correct. I think you later moved for a protective order, but importantly, you did not move along with or contemporaneously with the filing of these responses, and you're the one that's seeking the protection; is that correct?

MR. CHAMBLESS: That is correct.

THE COURT: List all medical providers that have treated you and why for the years 2020 to 2025. You objected and said it was overly broad in scope. Without waiving an objection, you said that the plaintiff was treated for a variety of mental and emotional distress and gave the name of some providers or a provider.

What is the basis for objecting to a request for

medical providers -- the identification of medical providers?

MR. CHAMBLESS: As to the medical, the issue would have been doctor-patient privilege to some of it. However, we also felt that the time frame was too broad; that it should have been narrowed to the time surrounding which these events took place that were complained of, but regardless we still gave the Joshua Tubbs and Ms. Krystal Patrick who were working with at least Z.P. And I'm looking at Z.P.'s response. I believe the other responses were similar; not the same provider but similar.

THE COURT: But let's go back to the time period for a second. The interaction between Z.P. and Mr. Bryant occurred in 2021; is that correct?

MR. CHAMBLESS: I believe that is correct, Your Honor.

THE COURT: And you're not suggesting that her damages ended sometime before today, are you? I mean, do you contend that she still suffers from emotional and mental damage as a result of the acts alleged in the complaint?

MR. CHAMBLESS: We both do and do not.

THE COURT: Okay.

MR. CHAMBLESS: For purposes of -- and I'm trying to phrase this a little bit. It is our position that the statute provides the damages, and that's all we will actually end up being able to go after or receive because we don't believe Mr. Bryant has the money or the assets to track down anything

greater than the statutory-provided amount for the acts taken place. For that reason, we don't hold that the mental and emotional damages are actually likely still ongoing. The damage occurred. She has been taking treatment since then and still takes treatment for issues that both were there before and after, and, you know, the ones we listed are ones that have been ongoing since.

THE COURT: Would you agree, though, if something happened in 2021 you would need to know what treatment a plaintiff sought in advance of that before 2021 to appreciate whether -- to prove causation?

MR. CHAMBLESS: Likely in a case like this, and we did give the two that she has been seeing ongoing before and after in this set and in the supplemental.

THE COURT: So if she was seeing someone before, why is it not fair for the defendants to get that information and ask for information even earlier to ensure -- to defend against your claim that his conduct caused these damages?

MR. CHAMBLESS: And that is one of the things we agreed -- once we talked to Mr. Burgess on the phone, that was one of the points we discussed and agreed to provide what we provided on September 3rd which said we got several other providers that they gave us in our second interview; Five Horizons, Susan Arnold at University Medical Center, Deann Green at (inaudible), West Alabama Family Practice, DCH

Emergency Medicine, which that one is May 25th -- May 2025 to present; West Alabama Imaging April to present.

THE COURT: Why didn't you provide that earlier?

MR. CHAMBLESS: Primarily because they did not give it to us when we asked. They only identified those two, originally.

THE COURT: Okay.

MR. CHAMBLESS: When we sat down with them --

THE COURT: But when a client does that, an attorney doesn't say, oh, okay, thanks; send it on. It's an obligation of the attorney to say we need more information; we have to have this information, and the reason that you do that is so that discovery can move on and things can be done within the time set out by the court. The plaintiff does not have the luxury of deciding when they're going to disclose information. The rules of civil procedure set that out.

MR. CHAMBLESS: Yes, Your Honor.

THE COURT: It seems to me when I look at these responses and your communication with the defendant that what you did was nothing over the summer, and you created this document to send them which in no way complies with your responsibilities under the rules of civil procedure and was nothing more than a huge waste of time for the defendant and then when they called you out on it, you provided them with an unprofessional response and then -- I mean, I have not seen

anything like this in the eight years I have been on the bench. I have seen more fulsome responses to interrogatories from pro se parties. The responses that you provided were in bad faith and they were overdue. That is not acceptable.

MR. CHAMBLESS: Yes, Your Honor.

THE COURT: And I hope that the students here understand that this is not something that they should do in their own practice. You may be seated.

MR. CHAMBLESS: Thank you.

THE COURT: Mr. Burgess, where are we on discovery?

MR. BURGESS: Yes, Your Honor. What was your -- what was your question, Judge? I missed it.

THE COURT: Where are we on discovery? Have you received complete responses to interrogatories?

MR. BURGESS: We have not received any responses that you don't have before you now. In terms of discovery, this case is -- we've moved nowhere since we were before you in September.

THE COURT: Is that a fact, plaintiffs' counsel?

MS. PALMER: We have given them the HIPAA release forms I believe since the last -- well, we did it before and asked for another one for Z.P. from the UA Health Center. We've provided that since then. Most of it -- what we've laid out is in the status report that we sent what we've done since then.

THE COURT: Okay.

MR. BURGESS: May I just mention one thing, Your Honor. You may recall we were before you in September. We discovered then that there were medical releases that had been laying around somewhere a long time.

THE COURT: I do remember that.

MR. BURGESS: So we got those at that time, and I just -- everybody ought to know, and we've acted on them in terms of moving. So --

THE COURT: Have you received responses to those?

MR. BURGESS: We have received a few responses from some of these providers that are listed.

THE COURT: Okay.

MR. BURGESS: Frankly, some have told us they can't find the records, but we've made the best effort we know. So when you mention discovery, I didn't really count that because I figured that -- giving us those releases actually happened last time when we were before you.

THE COURT: Correct.

MR. BURGESS: I've seen no reason for us to try to set depositions or I haven't known what exactly to do with response to these interrogatories as far as -- I've been able to predict what to do was to get before you today and get some direction. We told you, Judge; I stood before you in March with this team over here behind me and I said words to

this effect. I said we will make up for any lost time. We will not ask for delays. We will move this case forward as well as we can, and we're still committed to doing that.

THE COURT: What documents have you received from the plaintiffs?

MR. BURGESS: The documents we have received are those that we got originally that were actually produced before March when we got in the case. We got about 35 or so screenshots plus their Rule 26 information or their initial disclosures. Recently, and I may -- if we need to go this far, we received requests for admissions, I mean since this -- since we were before you in September, and we got -- I'm not going to try to quantify it and I don't know that you've asked me to, but we got a lot of pictures; we got a lot of screenshots, and it's like where the heck have they been? We haven't seen them before. We have produced, by the way, Judge, in our disclosures; and if I may turn to make sure my numbers are right. Haven't we produced 200 pages --

MS. AGRICOLA: Over 200.

MR. BURGESS: Over 200 pages of screenshots and information that our client has collected in terms of this case, and they have them all. We've gotten 31 pages. So I don't know what to make of all of that. I just -- I don't know. Now, we recently have been informed that Z.P. has lost her telephone. So I guess the court -- it doesn't matter that

I'm frustrated, but I am, and I'm just not sure what -- after many, many years of practice, I'm not sure what I'm supposed to do now without the court's assistance and that's why we're here, I guess.

THE COURT: Were the plaintiffs provided guidance about maintaining the evidence in the case?

MR. BURGESS: Is that a question for me?

THE COURT: I'm sorry. Did you instruct the plaintiffs that they were to preserve any and all correspondence; anything that could be used as evidence in this case?

MR. LINETSKY: I don't believe we gave them those specific instructions. I think the phone he may be mentioning wasn't a recent lost phone. They don't necessarily have the same phones that they had in 2021.

THE COURT: Okay. But even if they don't have the same phone they would still have access to the data that was on the phone because it transfers from phone to phone to phone.

MR. LINETSKY: We have asked them for all -- we have asked them for everything that they can find.

THE COURT: And when did you ask that?

MR. LINETSKY: We've been asking that since the beginning. And, Your Honor, in terms of timing, right before the last hearing we provided supplemental responses. That was

the September 3rd responses that the court asked for us to send. We did not hear anything from defense counsel as to those supplements saying we've looked at those supplements; here is still what we think is inadequate in those supplements.

THE COURT: I heard that at the hearing.

MR. LINETSKY: I don't recall if there were specific items identified that we needed to supplement past the September 3rd. It was our understanding that we would submit it to the court and the court would review those.

THE COURT: So typically when there's a motion to compel and you're waiting for the court what you do is you go back and you make sure that you've provided everything and you make sure that there is not any other interrogatory -- information that you can provide in response to the interrogatories. It's unusual in the face of a motion to compel for there to be silence on the other side.

MR. LINETSKY: We have been doing that, Your Honor, with all four of the clients, and I think the students can speak because they have the direct contact with the clients that --

THE COURT: But your clients are nonresponsive.

MR. LINETSKY: We are doing the best that we can to get the information from them, and I think again they can comment because they've had direct communications that they

have emphasized to them the importance of getting us all information that they possibly have.

THE COURT: Okay. Let me help you. For purposes of clarity, you don't get to object on the basis of relevance. Number 2 -- your interrogatory number 2 is not overly broad and there is no privacy objection. There is no objection on the basis of private and sensitive personal identifying information and as you all have previously conceded there is a protective order in place.

With respect to interrogatory 5, I want to be very clear that it says that you are to identify any communication regarding or relating to intimate visual depictions related to the allegations in this complaint. For each communication, you're required to identify the person with whom you spoke, your username that you used, and other parties communicated -- that you and the other parties used, the method of communication, and a summary of each such communication.

The objection to interrogatory 6 that the phrase each platform or media used is vague, overbroad, and ambiguous is overruled. The objection on the ground of privacy and safety is overruled. Number 8 needs to be answered. The objection number 11 is overruled. There is -- just period.

Number 12. Well, if your plaintiffs want to stand by their sworn response that the only intimate visual depictions that have been posted are those that are identified in the

complaint, that's fine.

Number 17 which requests the name and contact information of people who are referred to in the amended complaint, there is an objection that says that the disclosure of the identities of third parties whose safety and privacy must be protected is ludicrous and overruled.

The plaintiffs must provide the list of all medical providers who have treated them plus the basis for the treatment during the periods of 2020 to 2025.

The documents that the defendant has requested are due to be produced. You have 45 days. That is a gift. I will dismiss the complaint and will proceed on the counterclaim if we do not have the responses by then. Am I clear?

MR. LINETSKY: Yes, Your Honor.

THE COURT: Mr. Burgess, do you owe any discovery?

MR. BURGESS: As far as I know, we do not owe any discovery. Do we?

MS. PALMER: Yes. Yes, sir. It's the questions that we sent you along with the -- we sent him a flash drive. It's pictures that he mentioned earlier. And just to clarify, those were pictures that we had the client sit down and go one-by-one through the records we have from the Tuscaloosa Police Department, and they have narrowed it down and that's what they've identified as themselves. So that's part of the requests for admission that we sent to the defendants for him

to sit down and go through and admit whether it's one of these girls or not. It's a lot of those questions.

THE COURT: Okay.

MS. PALMER: And after -- I think right before 30 days they requested an extension, and we were fine with that and you granted it.

THE COURT: Okay.

MS. PALMER: So that is what we would like for that -- that's also reflected in I believe the motion for the -- for the extension for the discovery deadline. Yes, ma'am.

MR. BURGESS: Your Honor, may I make a response?

THE COURT: You may.

MR. BURGESS: I haven't looked at all of what's on that flash drive; Erin may have, but here's what I would like to say. Where has it been? And, by the way, whatever the --

THE COURT: That's irrelevant to me right now.

MR. BURGESS: Well, I'm just saying we don't know. We've asked for that. We've been waiting.

THE COURT: They have given you the stuff and they have said to go over it with your client, so do that, okay?

MR. BURGESS: We're going to do that.

THE COURT: Okay. Have you sought the medical records? I know that you have the names of the providers that have been given to you.

MR. BURGESS: Yes, we have. In fact, as of yesterday

I asked -- I'm not sure we brought it -- a list precisely who we have requested the records from and whether we've had responses.

THE COURT: Okay.

MR. BURGESS: I only know of one that we've actually gotten responses, but I will tell the court we got -- we got right on this.

THE COURT: No.

MR. BURGESS: I just thought I would say that.

THE COURT: I trust that. I just -- I'm trying to determine -- well, let me say this. In 45 days, I want a certificate of compliance. Defendants have two weeks in which to provide the court with any alleged deficiencies. I will review that immediately. I would also like within your notice of deficiencies, Mr. Burgess, for you to indicate the number of healthcare providers identified and of those providers who you have already subpoenaed so that I have an idea if there's 20 different providers but you've subpoenaed five that you still haven't even issued, not because you did anything wrong but you have not had the opportunity to issue a subpoena to the other 15.

MR. BURGESS: Understood. What I want to make sure that I'm clear on, Judge, I believe you told them they had a certain number of days to comply.

THE COURT: Uh-huh.

MR. BURGESS: And we've got two weeks to tell what the deficiencies are.

THE COURT: Uh-huh.

MR. BURGESS: So we got to tell you what the deficiencies are before they have a chance to finish? I'm just not quite understanding.

THE COURT: They have 45 days. After you receive it, you have two weeks.

MR. BURGESS: Oh, after we receive it. Excuse me. I thought -- okay. I thought we were counting from now.

THE COURT: No.

MR. BURGESS: Okay.

THE COURT: Okay. Let me just circle back on one issue that may avoid the need for subpoenaing medical records. Am I to understand that the only damages these plaintiffs seek are those under the statute, and by that I mean 15 U.S.C. 6851.

MR. LINETSKY: That is -- Your Honor, I believe the statute says the statutory amount or access if we claim higher damages. We believe, and we'll confirm with the clients, that with the number of images the statutory damages would exceed any actual damages.

THE COURT: So are you dismissing your claims for outrage and violation of privacy and felonious injury?

MR. LINETSKY: Not at this point, Your Honor, but we

also needed to allege those for standing.

THE COURT: Why do you need those counts for standing?

MR. LINETSKY: Well, we need to allege an actual injury for standing.

THE COURT: Are you saying that you were not injured under the statute that you're seeking damages for?

MR. LINETSKY: Well, Your Honor, as -- we were familiar with a lot of the FTCPA cases where claiming just the statutory damages has been held by courts to not be sufficient for Article 3 standing and that actual injury had to be alleged in addition to statutory injury.

THE COURT: That's true, but those are factual allegations. You don't need to file separate claims. Like you can file a single -- a complaint alleging a single violation of the FTCPA would have standing if you had alleged an actual injury in the statement of the facts, but my question is a little bit different. Because you're limiting yourself to these statutory damages then how are you entitled to damages -- if you're saying the only damages you're entitled to are -- or you're stipulating that you're only going after the damages for the images then there is no reason for discovery on damages relating to outrage or violation of privacy, and if all that is required under the statute is that the images were disclosed without consent then the damages that -- any emotional damages are not relevant.

MR. CHAMBLESS: I understand what the court is saying. Absolutely, Your Honor. We're not prepared to make that stipulation right now. That is something in light of our conversation today I think we need to sit down with our clients and make a decision on as the court suggested whether we proceed just on the statutory claim or an all of the --

THE COURT: I'm not suggesting what you do. That was what I was told you were doing.

MR. LINETSKY: I understand that. That is our -- that is lawyer thinking; not necessarily client thinking, and we can't make that decision without the clients, Your Honor.

THE COURT: That is true. Okay. Is there anything else we need to address?

MR. LINETSKY: Just, Your Honor, for the record, the images that we sent them were all from the Tuscaloosa Police Department that both parties had from the beginning of the litigation. It's nothing new.

THE COURT: But didn't you guys cull through them and identify which of those were your plaintiffs?

MR. LINETSKY: We did.

THE COURT: So, I mean, they needed you to do that, right?

MR. LINETSKY: We did it, but Mr. Bryant also is aware of which images he posted and who they were of.

MR. BURGESS: They're asking us now to tell them.

They haven't told us.

THE COURT: I mean --

MR. LINETSKY: We're asking them to admit or deny whether a particular image is of one of our clients and Mr. Bryant.

THE COURT: Okay. All right. We are adjourned. Thank you all.

(The proceedings were adjourned at 12:38 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript to the best of my ability from the record of proceedings in the above-entitled matter.

So certified on this date, January 26, 2026.

_________________________________

B. Stone Arledge, RPR, CRR, CCR
Federal Official Court Reporter